**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-03415-GPG-CYC

Farm Credit Leasing Services Corporation,

      Plaintiff,

v.

Good Forage, LLC; Clayton A. Good;
Arnold Good; and Wesley James Wittman,

      Defendants.

---

**PLAINTIFF FARM CREDIT LEASING SERVICES CORPORATION'S OPPOSITION
TO DEFENDANT WESLEY JAMES WITTMAN'S MOTION FOR SUMMARY
JUDGMENT**

---

I.      **Introduction**

Defendant Wesley Wittman ("Wittman") acknowledges that the central issue of whether he executed an equipment lease agreement, or is otherwise legally bound by it, cannot be determined as a matter of law. He nevertheless filed this doomed Motion for Summary Judgment ("Motion") seeking to be completely legally excused from responsibility for each of the causes of action in Farm Credit Leasing's ("FCL") Complaint, which include: (1) breach of contract (for the equipment lease agreement hereinafter identified as the "Swather Lease"); (2) unjust enrichment; (3) conversion; (4) civil theft; and (5) replevin. For all of the reasons set forth below, the Motion must be denied.[1]

Regarding FCL's claim for breach of the Swather Lease, Wittman is correct: this is not a simple case of undisputed "forgery." Indeed, substantial evidence demonstrates Wittman is liable under the Swather Lease because he executed, authorized, or otherwise ratified it. Wittman's admission notwithstanding, his Motion takes the remarkable position that this Court should rule as a matter of law that FCL waived its right to enforce the Swather Lease. Wittman's argument fails for several reasons. First, FCL never released Wittman, and the evidence he relies on establishes that FCL only offered to stop sending him default notices. Second, Wittman fails to establish the elements of waiver, in part, because there are genuine issues of material fact in dispute as to whether FCL had knowledge of all the relevant facts to be able to waive its rights. Indeed, Wittman not only failed to disclose material facts about his "forgery" allegations, but he actually misled FCL.

---

[1] FCL did not assert a civil theft claim against Wittman, so that argument is moot. FCL has offered to dismiss its conversion and replevin claims against Wittman.

Wittman ignores these facts and instead cherry-picks certain FCL emails taken out of context and sent after his misleading statements to FCL. Third, Wittman's reliance on the filing of a UCC amendment pertaining to the Swather Lease is a red herring because FCL is the owner of the equipment subject to the Swather Lease (the "Swather") and the initial UCC filing was for notice purposes only. Fourth, Wittman's argument runs contrary to the plain text of the Swather Lease and the Statute of Frauds, both of which require all modifications to be in writing and signed by all parties, which did not occur here.

The Court must also reject Wittman's arguments concerning FCL's unjust enrichment claim. Wittman relies on a classic strawman argument, in which he recasts FCL's liability and damages theories and then attacks the legal fiction he created. The evidence demonstrates that Wittman not only used the Swather at issue, but he also benefitted from having unlimited access to it so that he and Defendant Clayton Good ("C. Good") could jointly pursue growing their farming business. The benefit they enjoyed, without payment, is the value of the unpaid rental amounts due pursuant to the Swather Lease. FCL pled this in its Complaint. As such, Wittman's argument must be rejected.

## II.    Response to Statement of Undisputed Material Facts

1.    Undisputed.

2.    Undisputed.

3.    Undisputed.

4.    Undisputed.

5.    Undisputed.

6.    Undisputed.

CORE/3009126.0396/198847030.8

7.    Disputed. C. Good stated that Good Forage took on financial responsibility for the Swather and in return "Wittman use[d] the swather on his hay projects[.]" Ex. F, C. Good Responses to First Set of Discovery Requests, Responses to Interrogatory No. 12.[2]

8.    Undisputed.

9.    Undisputed.

10.    Undisputed.

11.    Disputed. Emails and notes from this period, along with deposition testimony, affidavits, and the terms of the Swather Lease, demonstrate that FCL intended to stop sending Wittman late payment notices, not legally release him from liability. Ex. W, October 21, 2020 Todd Strand Email 12:13pm, FCL 002149; Ex. X, October 21, 2020 Todd Strand Email 7:18am, FCL 0002175 ("Ex. X"); Ex. M, System Notes, FCL_0000913; Ex. Y, Excerpts of 30(b)(6) Depo. Transcript of Farm Credit Leasing ("Ex. Y"), 171:3-8; 171:13-172:4; 189:12-24; 208:18-22; Ex. B, Swather Lease ("Ex. B"), ¶16; Ex. Z, Aff. of Doug Fuchs ("Ex. Z"), ¶¶ 22, 30, 39; Ex. AA, Aff. of Todd Strand ("Ex. AA"), ¶¶ 10, 16.

12.    Undisputed.

13.    Undisputed.

14.    Disputed. The owner of the dealership from whom the Swather was obtained stated, "it appears that a copy of Mr. Wittman's driver's license was obtained from outside G&M's office," consistent with its practice where a "sales person would take a photograph of a person's driver's license with his cell phone and later print it when he

---

[2] Pursuant to D.C.COLO.LCivR 56.1(c), any references to Exhibits A – V are to the respective Exhibits attached to the Motion. Exhibits W – SS are attached hereto.

returned to the office" and, once all the applicants had signed the lease form, submitted copies of drivers' licenses to the lessor. Ex. U, Declaration of Glenn Pfeif, FCL 0000897.

15.    Disputed. *See* Response to Statement of Undisputed Material Fact No. 11.

16.    Disputed. *See* Response to Statement of Undisputed Material Fact No. 11.

17.    Disputed. *See* Response to Statement of Undisputed Material Fact No. 11.

18.    Disputed. *See* Response to Statement of Undisputed Material Fact No. 11. Further, FCL's corporate representative testified that Wittman's signature block appears on the lease and that Wittman "has done nothing on this point to prove, that this signature was not his signature." Ex. Y, 32:17-19, 97:11-13.

19.    Disputed. Releasing a UCC Financing Statement does not "delete" a debtor and is altogether irrelevant here since FCL owns the Swather. *See generally* Ex. B; *Compare* Minn. Stat. § 336.9-102 (39) (defining UCC Article IX "financing statements"); *and* Minn. Stat. § 336.9-109 (limiting the scope of UCC Article IX, generally, to transactions that create "security interests"); *with* Minn. Stat. §§ 336.2A (governing transactions that create a "lease," such as the Swather Lease).

20.    Undisputed.

21.    Undisputed.

22.    Undisputed, but immaterial. FCL sought damages for unjust enrichment against Wittman in its Complaint based on the value of the Swather that Wittman and Good Forage did not pay for as defined by the Swather Lease. Ex. A, Complaint ("Ex. A").

23.    Disputed. Discovery reveals that Wittman thought he had an ownership interest in Good Forage and in a joint farming enterprise with C. Good and Case Devries;

thus, his use of the Swather was for his personal benefit. Ex. BB, Emails w/ Subject: RE: Lease account Good Forage, LLC ("Ex. BB"), Wittman_000010-11; Ex. CC, Email w/ Subject: Lawsuit ("Ex. CC"), Wittman_001008; Ex. DD, Excerpts of W. Wittman Depo. Transcript ("Ex. DD"), 79:13-20; 80:5-6; 82:3-19; 84:9-86:5; 89:5-92:22; 95:6-96:20; 102:18-104:13; 106:7-21; 113:15-16, 132:14-133:14; Ex. OO, Big Case Hay Co LLC Vendor Report ("Ex. OO"); Ex. PP, Big Case Hay Co LLC Checks to Witman ("Ex. PP").

24.     Disputed. Response to Statement of Undisputed Material Fact Nos. 7, 23.

25.     Undisputed.

26.     Undisputed.

27.     Undisputed.

28.     Undisputed.

29.     Undisputed.

30.     Undisputed.

## III.    Statement of Additional Disputed Facts

1.      Wittman began performing agricultural work with Good Forage LLC ("Good Forage") in or around 2013 or 2014, years after dating his wife, C. Good's sister, and around the same time that C. Good founded Good Forage. Ex. DD, 29:2-30:25.

2.      Wittman's principal work was transporting and operating Good Forage's equipment, and he also located customers and employees for Good Forage. Ex. D, Wittman's Second Amended Response to Farm Credit's First Set of Discovery Requests ("Ex. D"), Response to Interrogatory No. 15; Ex. DD, 64:6-13, 115:17-116:3; Ex. EE, Wittman's Response to Farm Credit's Second Set of Discovery Requests, Responses to

RFA Nos. 20, 21; Ex. FF, Text Messages ("Ex. FF"), p. 2.

3.     During this litigation, Wittman has mischaracterized himself as a "hourly laborer" for Good Forage. *See, e.g.*, Ex. D, Response to Interrogatory No. 11.

4.     Indeed, while working with Good Forage, Wittman had access to and reviewed Good Forage's financial documents. Ex. DD, 52:16-21.

5.     Also, Wittman and C. Good were the only individuals associated with Good Forage who had fuel cards from Good Forage, which Wittman kept in his possession and used for farming expenses. Ex. DD, 73:9-76:22.

6.     Further, Wittman previously co-signed a lease with Good Forage for a different swather (not subject to this lawsuit) and identified himself as 25 percent owner of Good Forage on that credit application. Ex. D, Responses to Interrogatories Nos. 1, 4; Ex. GG, Application for Credit ("Ex. GG"); Ex. DD, 34:12-20; 59:17-21; 117:5-118:12; 119:1-121:14.

7.     Wittman, C. Good, and a third individual (Case Devries) performed agricultural work together, wherein certain projects were performed by only Wittman and C. Good, others by Wittman and Case Devries, others by Case Devries and C. Good, and others involving all three individuals. Ex. DD, 79:13-20; 80:5-6; 82:3-18; 84:9-86:5; 89:5-92:22; 95:8-17; 96:11-13; 102:18-104:13; 106:7-21; 113:15-16; Ex. OO; Ex. PP.

8.     Wittman was paid for these farming deals in a variety of ways, depending on who was involved between him, C. Good, and Case Devries, who the customer was, and what work he performed. Ex. DD, 79:13-20; 80:5-6; 82:3-18; 84:9-86:5; 89:5-92:22; 95:8-17; 96:11-13; 102:18-104:13; 106:7-21; 113:15-16; Ex. OO; Ex. PP.

CORE/3009126.0396/198847030.8

9.      For example, in relation to one deal, Case Devries paid Wittman $6,000 because C. Good was allegedly refusing to pay him. Ex. DD,102:18-104:13.

10.     In July 2019, C. Good asked Wittman about partnering to purchase or lease additional equipment for Good Forage's operation. Ex. FF, p. 3; Ex. DD,145:1-146:12.

11.     Wittman contends that he told C. Good he would partner on another equipment transaction if he had an ownership stake in Good Forage. Ex. BB, Wittman_000011; Ex. D, Response to Interrogatory No. 1; Ex. DD,130:7-13.

12.     C. Good assured Wittman that he had an ownership interest in Good Forage. Ex, BB, Wittman_000011; Ex. CC, Wittman_001008; Ex. DD,132:14-133:14.

13.     Wittman and C. Good continued to discuss obtaining additional equipment together, which ultimately turned out to be the Swather, between August 5, 2019, and August 9, 2019. Ex. FF, pp. 9-16; Ex. D, Response to Interrogatory No. 1; Ex. DD,129:6-14; 133:10-20; 134:8-135:24; 147:17-148:17 150:8-16; 151:7-16; 151:20-152:15; 153:15-21; 154:11-155:7; 155:15-156:13; 156:20-160:25; 164:24-165:2; 167:4-19; 172:8-19; 176:12-177:22.

14.     On August 5, 2019, Wittman emailed his tax documents to Randall Walter, a salesperson at G&M Implement, the equipment dealer where the Swather was obtained. Ex. FF, p. 6; Ex. DD,162:11-163:10.

15.     On August 6, 2019, Wittman sent his ID and social security number to C. Good for use in applying for the Swather. Ex. FF, pp. 7-8.

16.     The Swather Lease was executed on August 9, 2019, and bears a signature purporting to be that of Wittman. Ex. B, p. 4.

17.    On the day the Swather Lease was executed, Wittman was outwardly manifesting his willingness to enter into the Swather Lease transaction and knew that Ag Direct, with whom FCL shared the transaction, was relying solely on his credit to finance the Swather Lease. Ex. FF, pp. 15-16; Ex. QQ, AgDirect Financing Application ("Ex. QQ"); Ex. RR, AgDirect Application No. 2415257, Wittman_004547.

18.    Wittman and C. Good exchanged numerous text messages regarding obtaining the Swather and Wittman signing the Swather Lease on the day it was executed, including C. Good telling Wittman he would see if Wittman could sign the Swather Lease electronically. Ex. DD, 201:22-202:19; Ex. FF, pp. 18-23.

19.    C. Good sent Wittman pictures and specifications of the Swather. Wittman responded stating "Sweet", "Oh boy", and "oh mama." Ex. FF, pp.18-21.

20.    Wittman was aware that C. Good obtained the Swather on the day the Swather Lease was executed. Ex. FF, pp. 18-23; Ex. DD, 204:15-23.

21.    There is no text message between Wittman and C. Good stating that Wittman was unwilling to sign the Swather Lease. Ex. FF, pp. 18-23.

22.    Wittman used the Swather about two days after the Swather Lease was signed. Ex. FF, pp. 23-25.

23.    C. Good texted Wittman three days after the Swather Lease was signed stating that "*we bought that swather*," and Wittman did not object. Ex. FF, p. 26 (emphasis added); Ex. DD, 221:16-222:6.

24.    Around August 26, 2019, Wittman, Case Devries, and C. Good became mired in a dispute regarding their farming business. Ex. FF, p. 27.

CORE/3009126.0396/198847030.8

25.     On August 28, 2019, Wittman texted C. Good regarding the dispute, stating, "if you guys don't figure something out by the end of the day, this is my last job, and I'm out." Ex. DD, 259; Ex. FF, p. 28.

26.     Just days later, on September 3, 2019, Wittman called FCL and asked what would happen if he asked to be removed from the Swather Lease. Ex. KK, Queue ("Ex. KK"), FCL_00002055-0002058; Ex. LL, CoBank System Screenshots ("Ex. LL"), FCL_0002093-95; Ex. DD, 254:3-258:6; Ex. Y, 159:3-22; 206:2-23.

27.     There is no evidence that during his September 3, 2019, call to FCL, Wittman contested the authenticity of his signature, mentioned forgery, or questioned whether he was a party to the Swather Lease. Ex. KK, FCL_00002052-0002058; Ex. LL, FCL_0002093-95; Ex. DD, 254:3-258:6; Ex. Y, 159:3-22; 206:2-23.

28.     On September 4, 2019, Wittman and C. Good met for coffee to discuss their business plans moving forward together. Ex. FF, p. 29.

29.     After the meeting, Wittman, C. Good, and Case Devries continued to perform agricultural projects together. Ex. DD, 260; Ex. FF, pp. 30-31, 33-35.

30.     On September 5 and 9, 2019, FCL returned Wittman's September 3 call, but he did not answer or return FCL's calls. Ex. KK, FCL_00002052-0002058; Ex. LL, FCL_0002093; Ex. MM, Additional CoBank System Screenshots, FCL_0002012.

31.     On October 10, 2019, FCL called Wittman about a past due balance on the Swather Lease, and Wittman stated that he would tell C. Good, but he did not mention forgery or question if he was on the Swather Lease. Ex. KK, FCL_0002052; Ex. Z, ¶10.

32.     Wittman continued to work with C. Good into 2020. Ex. DD, 243:14-245:18.

9

33.    Wittman operated the Swather between August 2019 into 2020. Ex. D, Response to Interrogatory No. 10.

34.    During this time, Wittman and C. Good discussed expanding their work and starting a new LLC in which they would equally split ownership. Ex. FF, pp. 36-45.

35.    However, in February 2020, Wittman took a real estate job. Ex. FF, p. 46.

36.    Wittman testified that during an informal mediation in June 2020, C. Good advised that Wittman did not have an ownership interest in Good Forage. Ex. DD, 230:21-232:7; Ex. HH, Excerpts of A. Good Depo. Transcript, 87:3-19.

37.    By June 2020, Wittman was not doing agricultural work with Good Forage or discussing new agricultural projects or LLCs with C. Good. Ex. FF, p. 46.

38.    In August of 2020, after receiving a notice of default from FCL regarding the Swather Lease, Wittman contacted FCL, claiming for the first time that his signature on the Swather Lease was forged. Ex. Y, 162:15-164:3; Ex. LL, FCL_0002096-97; Ex. BB, Wittman_000010-12; Ex. DD, 131:3-132:21.

39.    FCL said that it took the matter seriously and asked Wittman to provide a copy of his driver's license and a sworn affidavit stating his position. FCL said a criminal referral may be involved once all information was reviewed. Ex. BB, Wittman_000010-12.

40.    Wittman provided FCL with a copy of his drivers' license, a written statement, and an email message describing his forgery allegations, but he did not provide a sworn affidavit. Ex. BB, Wittman_000010-12; Ex. II, W. Wittman Letter ("Ex. II").

41.    Wittman's email claimed he learned he did not have an ownership interest in Good Forage two days after sending his tax documents. Ex. BB, Wittman_000010-12.

42.     After reviewing the materials Wittman provided, FCL decided to only cease sending Wittman late payment notices. Ex. X; Ex. BB, Wittman_000010.

43.     On September 10, 2020, Lynn Pauly of FCL emailed Wittman that FCL had "updated our systems to reflect the information you provided" and that "you should no longer received late payment notices for this account." Ex. BB, Wittman_000010; Ex. Y, 171:3-8; 171:13-172:4; 189:12-24; 208:18-22.

44.     Ms. Pauly testified she did not tell Wittman that FCL was releasing him, because FCL did not want to release him from liability and only intended that "no other further collection letters to be sent to him on the account." Ex. Y, 171:20-172:4.

45.     No forgery criminal referral was made because FCL believed it was a "family dispute" and "Wittman actually signed" the lease. Ex. Y, 167:20-23; 176:2-10, 223:3-5.

46.     Ms. Pauly testified if FCL is "going to formally release someone from a lease, then he would be signing, and the other parties would be signing that they agreed to that." Ex. Y, 171:20-172:4.

47.     The Swather Lease likewise provides that "[t]his Lease . . . may be modified only by a written instrument signed by Lessor and Lesse." Ex. B, ¶16.

48.     FCL and Wittman never executed a written instrument stating that FCL was releasing Wittman from the Swather Lease. Ex. Y, 171:20-172:4.

49.     Wittman later testified he was unsure when he learned he had no interest in Good Forage and admitted his statement to Ms. Pauly about the timing of learning he had no interest may have been incorrect. Ex. DD, 225:5-10; 228:12-20, 230:9-20.

**IV.     Choice of Law**

CORE/3009126.0396/198847030.8

Wittman applies "legal authority from both Minnesota and Colorado" in his Motion. Mot., p. 9. However, Minnesota law applies to the breach of contract issues raised by Wittman and Colorado law applies to the non-contractual claim, i.e., unjust enrichment. The Swather Lease provides: "This Lease shall be interpreted, construed and enforced in accordance with the laws of the State of Minnesota." Ex. B, ¶16. As such, Minnesota law applies to Wittman's waiver argument related to FCL's breach of contract claim.

FCL disagrees with Wittman that "[t]he Court should reject Farm Credit's attempt to plead any claim(s) under Colorado law." Mot., p. 9. While the Swather Lease's choice of law provision applies to issues of contract interpretation, construction, and enforcement, none of these issues are raised by FCL's non-contract claim, which, based on the connections of the parties and subject matter to Colorado, is governed by Colorado law. *See Ranger v. Fortune Ins. Co.*, 881 P.2d 394 (Colo. App. 1994).

## V.    Argument

For the following reasons, Wittman is not entitled to summary judgment.

### A.    Wittman's "waiver" defense argument fails as a matter of law.

Wittman alleges FCL waived its rights against him under the Swather Lease. Mot., pp. 9-12. However, Wittman cannot make the required showings to prove common law or statutory waiver, and his waiver defense is also barred by the terms of the Swather Lease and the Statute of Frauds.

#### 1.  Wittman fails to establish statutory waiver.

Wittman's only authority for statutory waiver is Minn. Stat. §336.2A-107 (2024), which states that "[a]ny claim or right arising out of an alleged default or breach of

12

warranty may be discharged . . . by a waiver or renunciation in a signed record[.]" *Id.*

Thus, Wittman must show (1) a waiver or renunciation, (2) a "signed record" of the waiver

and (3) that the waiver arises from an alleged default or breach of warranty. Wittman

cannot establish any of these elements.

First, as set forth in Section V.A.2, Wittman cannot show that FCL knowingly

committed a waiver or renunciation. Second, the alleged waiver was not for a "default" or

"breach of warranty" (Wittman argues full "release"). Third, there is no signed record of a

waiver. The only "record" Wittman relies on is an unsigned email that does not mention

release. Ex. BB, Wittman_0000010. Lynn Pauly, who authored the email, testified FCL

did not intend to release Wittman. Ex. Y, 171:3-8; 171:13-172:4; 189:12-24; 208:18-22.

### 2.  Wittman fails to establish common law waiver.

To prove common law waiver, Wittman must show that FCL had "(1) knowledge of

the right, and (2) an intent to waive the right." *White v. City of Elk River*, 840 N.W.2d 43,

51 (Minn. 2013). Waiver is an affirmative defense, and the party asserting it has burden

of proving it. *HealthPartners, Inc. v. Aetna Health Mgmt., Inc.*, No. CIV. 00-1895 JRTFLN,

2003 WL 2144886, *3 (D. Minn. June 19, 2003). "Waiver is generally a question of fact[.]"

*Valspar Refinish Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 367 (Minn. 2009).

### i.    FCL lacked full knowledge of its legal rights against Wittman.

The party asserting waiver must show that the party against whom waiver is

asserted "had full knowledge of [its] legal rights" at the time it allegedly waived those

rights. *Carpenter v. Vreeman*, 409 N.W.2d 258, 262 (Minn. Ct. App.1987). A party cannot

have knowledge of its legal rights where it lacks full knowledge of all relevant facts.

CORE/3009126.0396/198847030.8

*Sheldon v. Indep. Sch. Dist. No. 284, Wayzata*, No. A10-1186, 2011 WL 1236167, *4
(Minn. Ct. App. Apr. 5, 2011); *In re Digital Res., LLC*, 246 B.R. 357, 370 (B.A.P. 8th Cir.
2000). Thus, Wittman must prove that FCL had all material facts, which he cannot do.

Wittman merely cherry picks a few FCL emails and points to an irrelevant UCC
Amendment. Wittman, however, ignores that he failed to inform FCL of (and FCL did not
have) the following material facts concerning the Swather Lease and that he misled FCL
when presenting his forgery allegations, all of which would have been material to FCL's
knowledge of the facts and its rights against Wittman under the Swather Lease:

- Wittman previously entered into a swather lease with C. Good (Ex. D, Response
  to Interrogatories Nos. 1, 4; Ex. GG; Ex. DD, 34:12-20; 59:17-21; 117:5-118:12);

- Wittman agreed to, and did, participate in the prequalification and approval process
  for the Swather Lease (Ex. FF, pp. 4-5, 7-8; Ex. QQ);

- Wittman and C. Good exchanged over a dozen text messages regarding executing
  the Swather Lease and obtaining the Swather on the day the Swather Lease was
  executed (Ex. FF, pp. 18-23);

- There are no text messages from Wittman to C. Good disputing his willingness to
  participate in the Swather Lease (Ex. FF, pp. 18-23);

- Wittman knew C. Good took possession of the Swather on August 9, 2019 (Ex.
  DD, 204:15-23);

- Wittman used the Swather within days of the execution of the Swather Lease (Ex.
  FF, pp. 23-25);

- C. Good sent Wittman a text that said "we" purchased the Swather that was not
  disputed by Wittman (Ex. FF, p. 26; Ex. DD, 221:16-222:4);

- Wittman, C. Good, and Case Devries engaged in multiple agriculture business
  dealings that included using the Swather (Ex. DD, 260; Ex. FF, pp. 30-31, 33-35;
  Ex. OO, Ex. PP).

Wittman also did not disclose his prior call to FCL where he asked what would

happen if he sought to be released from the Swather Lease or that he failed to return FCL's calls when issues with his agricultural business ventures resolved following a meeting with C. Good. Ex. DD, 284:10-19. Indeed, Wittman would have no reason to return FCL's calls, as his concerns regarding his business arrangements were resolved and he wanted to use (and did use) the Swather for his business with C. Good and Case Devries. Ex. FF, 36-44; Ex. DD, 260.

Wittman also mislead FCL. Wittman told FCL that he was willing to enter the Swather Lease because he thought he had an interest in Good Forage but learned two days after sending his tax information that he did not. Ex. BB, Wittman_000010-11. The reasonable inference as to why he said this was to lead FCL to believe that he learned shortly after submitting his tax information (but before the Swather Lease was signed) that he had no interest in Good Forage and, thus, he backed out before the Swather Lease was signed. This was untrue. Wittman submitted his tax information on August 5, 2019, the Swather Lease was signed four days later, and his text messages that day reveal he was still on board. Confronted with this at his deposition, Wittman could not say when he learned he had no interest and admitted he must have been mistaken about the two days statement. Ex. DD, 186:13-188:1; 188:11-189:10. Wittman also told FCL that he did not "did not apply . . . for this contract," Ex. II, Wittman_000022, yet his text messages reveal that Wittman knew AgDirect was relying solely on his credit for the lease. Ex. FF, pp. 15-17.

Due to Wittman's omissions and misstatements, FCL was not aware of numerous facts which strongly evidence that Wittman authorized or executed the Swather Lease

when Wittman reported the purported forgery to FCL and asked to be released from liability. Interestingly, Wittman argues (and reported to FCL) that he never signed the Swather Lease and it was forged. Now he claims that FCL's actions in response constitute a *known* waiver of a right he claims FCL never had. Irrespective of this contradiction, FCL did not have all the relevant facts and, thus, Wittman cannot prove the first element of waiver. *In re Digital Res., LLC*, 246 B.R. 357, 370 (B.A.P. 8th Cir. 2000). At minimum, genuine issues of material fact exist concerning FCL's knowledge, making summary judgment inappropriate. *Chin v. Zoet*, 418 N.W.2d 191, 195 (Minn. Ct. App. 1988).

> ii.    **The evidence shows that FCL did not intend to release Wittman.**

The party asserting waiver must establish that the other party "intended to relinquish [its] rights." *Freitag v. Wolf*, 303 Minn. 139, 142 (1975). Wittman argues FCL's actions in response to his forgery claim demonstrate that FCL intended to waive its rights against him under the Swather Lease. Mot., pp. 12-13. However, Wittman fails to disclose numerous other facts, which undermine his argument and demonstrate that FCL intended *only* to stop sending him late payment notices, not release him from liability.

FCL's corporate representative testified that the terms, "remove" and "release," have distinct meanings in the leasing industry. Ex. Y, 228:4-12; 229:9-13. Every FCL representative testified that FCL did not intend to release Wittman, but only to remove him from late payment notices. Ex. Y, 164:25-165:13; 171:13-172:4; 112:2-5; 112:11-14. The only correspondence that Wittman received from FCL states that he will no longer receive late notices and it does not say that FCL was *releasing* him from liability. Ex. BB, Wittman_0000010 (informing Wittman that "you should no longer receive late payment

notices for this account"). FCL's corporate representative, Lynn Pauly, who authored and sent that email, testified that she did not tell Wittman FCL was releasing him, because FCL decided not to release him. Ex. Y, 171:3-8; 171:13-172:4; 189:12-24; 208:18-22. She also testified that for a release to occur, FCL's policy requires FCL and the lessee to sign a release document. Ex. Y, 171:20-172:4 (if FCL is "going to formally release someone from a lease, then he would be signing, and the other parties would be signing that they agreed to that"). The Swather Lease similarly states that it can only be modified by a writing signed by the lessor and lessee. Ex. B, ¶16. No such writing exists.[3]

Wittman relies on a few internal emails from FCL employees Mr. Fuchs and Mr. Strand, one of whom imprecisely said "release" instead of "remove" internally, and the UCC Amendment. The employees signed affidavits stating the emails were imprecise and FCL did not intend to release Wittman. Ex. Z, ¶¶ 22, 30, 39; Ex. AA, ¶16; Ex. NN, FCL_0002144-45. The employee also stated that the UCC Amendment was filed to placate Wittman and not reflective of an intent to release him.[4]  Ex. Z, ¶ 28.

In short, Wittman fails to establish that FCL intended to release him from the Swather Lease, and the evidence demonstrates that FCL only intended to stop sending him late payment notices. *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009); *In re Enggren's Enters.*, Inc., 253 B.R. 431, 435 (B.A.P. 8th Cir. 2000). At

---

[3] The email does not say Wittman is being released; Ms. Pauly testified that she did not use the word "release" because FCL was not releasing him, and the email is not signed.

[4] The UCC Financing Statement (which is typically filed by a lender to provide notice to other lenders of a lien the lender has on collateral or by a lessor to provide notice of its ownership interest to others) and subsequent UCC Amendment have no legal bearing on FCL's interest in the Swather because FCL owns the Swather.

minimum, there are genuine issues of material fact as to whether FCL intended to release Wittman precluding summary judgment. *Engstrom v. Farmers & Bankers Life Ins. Co.*, 230 Minn. 308 (1950) (stating waiver is a fact issue for jury).

### iii. Wittman's waiver defense is barred by the Statute of Frauds for credit agreements and the plain language of the Swather Lease.

Minnesota's Statute of Frauds provides that any modification to a credit agreement, including the Swather Lease, must be in writing signed by both the creditor and the debtor to be enforceable. Minn. Stat. § 513.33 (2010). It includes situations where, as here, a debtor contends the creditor is forbearing "from exercising remedies under prior credit agreements[.]" *Id*. at § 513.33. The Swather Lease also provides that it may be modified "only by a written instrument signed by Lessor and Lesse." Ex. B, ¶16. Here, there is no writing, much less one signed by FCL and Wittman, in which FCL agreed to forbear from exercising its rights under the Swather Lease. Thus, Wittman is unable to demonstrate that FCL waived any rights under the Swather Lease as a matter of law.

### B. FCL has a basis to support its unjust enrichment damages.

Wittman seeks summary judgment on FCL's unjust enrichment claim, arguing it "is undisputed that the only evidence uncovered by discovery supporting Farm Credit's unjust enrichment theory is C. Good's expected trial testimony that Mr. Wittman did use the swather and/or other farm equipment for personal work unconnected with Good Forage." Mot., p. 13. Wittman argues that FCL cannot prove how much he received from using the Swather and FCL's Initial Disclosures do not include unjust enrichment

damages. *Id.* at 5.[5] Alternatively, he asks that FCL's damages be limited to $1. *Id.* at 14.

Wittman's arguments fail because he ignores FCL's actual damages theory: the value of Wittman and Good Forage's unlimited access to and use of the Swather, which is reflected by the unpaid rentals and other amounts outstanding from Wittman and Good Forage under the Swather Lease. In its Complaint, FCL pled the value of the unpaid use of the Swather by Wittman and Good Forage, determined by amounts due pursuant to the Swather Lease, as the basis for damages for its unjust enrichment claim. Specifically, FCL's Complaint alleges that "Defendants have received a benefit by leasing, possessing, and using the Equipment" and that "[i]n return, Defendants promised to make payments to" FCL, but they did not do so. Ex. A, ¶¶71-73. It further states that Defendants were "unjustly enriched in an amount as of October 13, 2023, of not less than $374,806.13, plus costs and expenses incurred, and it would be unjust for Defendants to retain the benefits received from Farm Credit Leasing without payment." The $374,806.13 amount was a total of all the lease amounts then due as set forth in the Complaint. Thus, FCL alleged unjust enrichment damages for the value of the amounts due under the leases, not for Wittman's "personal work unconnected with Good Forage." Mot., p. 13.

FCL continued to develop its damages theory during discovery. FCL's corporate representative testified that the amounts contained in deposition Exhibit 31, plus legal fees, were the damages FCL sought at that point against Wittman. Ex. Y, 268:25-269:21. The damages reflected in that exhibit, as related to Wittman, is the value of unlimited access to and use of the Swather by Wittman and Good Forage for which they did not

---

[5] FCL has supplemented its disclosures to be consistent with its Complaint allegations.

pay, as determined by the amounts then due pursuant to the Swather Lease. [6] Ex. JJ, Account Summary. Likewise, FCL has amended its initial disclosures to reflect that it seeks an amount of not less than $205,102.57, the amount due pursuant to the Swather Lease as of April 18, 2025, as damages for its unjust enrichment claim against Wittman. Ex. SS, FCL's Fourth Supplement to Initial Disclosures, p. 2.

Case law supports an unjust enrichment damages theory based on the value of an equipment lease. In *Sunbelt Rentals, Inc. v. A & A Quality Appliance, Inc.*, the plaintiff leased a manlift to the defendant and was not paid. No. 21CA0069, 2022 WL 22924392, at *1 (Colo. App. 2022). The court found the lease agreement unenforceable, but awarded the plaintiff "delivery and pick-up charges, rental fees, late fees, and interest," as determined by the lease, under an unjust enrichment theory. *Id.* at *1, *5.

Wittman has been on notice of FCL's unjust enrichment damages theory from the beginning. Wittman's attempt to alter FCL's damages theory to the amount Wittman personally received from his use of the Swather unconnected to Good Forage, and his attack on that straw man, should be rejected. Wittman also provides no legal support for his request that FCL's damages be limited to $1, which should be rejected.

**C.    Wittman's conversion, replevin, and civil theft arguments are moot.**

FCL did not bring a civil theft claim against Wittman. FCL has offered to dismiss its conversion and replevin claims against Wittman.

---

[6] The difference between the damages in the Complaint and Exhibit 31 is that FCL is now seeking damages against Wittman related only to the Swather, as opposed to all of the equipment. FCL's damages for its breach of contract and unjust enrichment claims are the same amount. FCL was not asked during its deposition whether the amounts sought were the same or different or anything about its unjust enrichment damages.

Respectfully submitted this 16th day of May, 2025.

s/ Benjamin J. Court
Benjamin J. Court
**STINSON LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Phone: 612.335.1615
Email: benjamin.court@stinson.com

Zane A. Gilmer
Ryan M. Sugden
**STINSON LLP**
1144 Fifteenth Street, Suite 2400
Denver, CO 80202
Phone: 303.376.8416
Emails: zane.gilmer@stinson.com
            ryan.sugden@stinson.com

*Attorneys for Plaintiff Farm Credit Leasing Services Corporation*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 16, 2025, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system. The undersigned hereby also certifies that on May 16, 2025, a copy of this document was sent via email to Pro Se Defendant Clayton A. Good.

*s/ Benjamin J. Court*
Benjamin J. Court

22